### In re STAMLER.

District Court, D. New Jersey.
May 19, 1934.

· R. S. Nichols, of New York City, for trustee.

Merritt Lane, of Newark, N. J., for bankrupt.

CLARK, District Judge.

The court is constrained to order the discharge of the above-named bankrupt. It says "constrained" advisedly. Our bankruptcy system has been set up largely on a theory of "creditor control." It has been our legislative view that since the creditors are principal parties in interest they should be left to work out their own salvation. Like a great many other theories, this one overlooks the practical facts. Often the ultimate sufferers by a bankruptcy are not the technical creditors. They may be the consumers to whom merchandise creditors sell or they may be, as in this case, the depositors in banks whose money disappears in loans. Furthermore, the general public is vitally interested in a wisely administered bankruptcy system. Yet our creditor control policy gives no representation to either these actual sufferers or to the general public.

Section 32, title 11 USCA (the discharge section), prescribes the policy as follows: "The judge shall hear the application for a discharge and such proofs and pleas as may be made in opposition thereto by the trustee or other parties in interest, at such time as will give the trustee or parties in interest a reasonable opportunity to be fully heard, and investigate the merits of the application and discharge the applicant unless  *   *   * "

It will be observed that this statute, like so many others, admits of interpretation. The words, "investigate the merits of the application," might be construed as a grant of power to the judge acting sponte sua. That has been the view of some district courts. In re Luftig (D. C. Mass.) 162 F. 322. Unfortunately (also used advisedly) they are in combination with and qualified by other words indicating a hearing with pleas in opposition. The overwhelming weight of authority, including a United States Supreme

Court dictum, proscribes any action except by the creditors. The cases are collected in sections 32–52, title 11 USCA, page 73; 1933 Cumulative Annual, page 11. See, also, Freshman v. Atkins (C. C. A.) 294 F. 867, affirmed 269 U. S. 121, 46 S. Ct. 41, 70 L. Ed. 193; American State Bank v. Ullrich (C. C. A.) 28 F.(2d) 753.

The bankrupt in the principal case is, or rather was, the president of a national bank (New Jersey National Bank & Trust Company). He filed a voluntary petition in bankruptcy on October 14, 1932. His attached schedules show assets of $1,325,637.55 and liabilities of $2,142,788.66, a paper failure for $817,151.11. An examination of the list of his securities put up as collateral indicates that the actual deficiency is greater. A great amount of this collateral seems to have been the stock of the bank of which the said bankrupt was president. This bank has closed its doors, is in liquidation, and its stock, far from having any value, has been assessed.

One month after the filing of the petition, the bankrupt, as was his right, petitioned the court for the "high privilege" of a discharge. In re Northridge (D. C. N. Y.) 53 F.(2d) 858. On December 8 and 22, 1932, and January 9, 1933, he was examined at length by counsel for the trustee. Thereafter, and in January, 1933, three creditors filed specifications of objections to the discharge. One set of objections charged the bankrupt with various fraudulent practices. Exceptions to them were sustained because, whatever the enormities they disclosed, they did not charge violations of the Bankruptcy Act.

Two sets of objections, in hæc verba, were filed by the Chase National Bank of New York and by the controller's representative in charge of the liquidation of the bankrupt's own bank. The former withdrew its objections to the discharge because of its vice president's unwillingness to proceed without a showing of "pecuniary advantage." This left the specifications of the controller's receiver. They charged improper bookkeeping, concealment, false oaths, and failure to explain loss and deficiency of assets. The specifications were set down for hearing on October 19, 1933. At this hearing the question of "immediate pecuniary advantage" was also raised by the controller's representative, and the same decision as to prosecution was reached by him.

On being apprised of the situation thus presented, the referee and the trustee adopted the procedure suggested in the well-considered case of In re Whitney (D. C. Mass.) 250 F. 1005. The referee called a creditors' meeting for the purpose of "considering whether the trustee should be authorized to file and prosecute objections." Due notice was sent to all creditors. The following attended: C. P. Rogers, receiver, New Jersey National Bank & Trust Company, Elizabethport Banking Company, National State Bank, Hyman Friedman, Harvey Redden, New Brunswick Trust Company, George S. Silzer, and Elizabeth Trust Company. They represented claims in the amount of $1,371,472.95. The referee and the trustee explained to these creditors the purpose of the meeting. After this explanation a vote was taken upon the question of authorizing the trustee to act as aforesaid. The vote found every creditor, except the bankrupt's closed bank (through its receiver), voting in favor of allowing the bankrupt to go out and accumulate another fortune, if he could, without being under any legal obligation to repay his past creditors.

The claim of the liquidating bank was for more than half of the claims present and voting. Another curious feature of our creditor control theory lies in the inclusion therein of what might be described as a political element. The suffrage is universal as well as according to interest, and so requires a majority vote in number as well as in amount of claims. Section 92, 11 USCA; section 704, Remington on Bankruptcy. Corporate management according to shareholders rather than shares would be analogous.

Is it any wonder that we commenced this opinion with a doubt about the effectiveness and, therefore, the wisdom of creditor control? We have no wish to seem unsympathetic towards any one who in these days has suffered financial reverses. We also have no proof and accordingly no opinion about the truth of the charges made against the bankrupt. We only know that they were investigated by the trustee and his attorney, and that as a result of such investigation he felt that a hearing on them should be had. That hearing will not be had because such is not the pleasure of the creditors. We can understand an individual creditor through motives of friendship, for instance, being willing to forego the right the law gives him to be repaid by a certain type of bankrupt. We cannot understand such an attitude on the part of creditors who are themselves quasi trustees for others.

The public is interested in commercial integrity, and so in the repayment of pri-

vate debts. It has been considered sound policy to excuse from that repayment those who have been unfortunate. The United States has gone farther in that direction than any other country in the world. It has seen fit to include in those worthy of a fresh start those whose business practices have been of a character making such a start inevitable. So our Bankruptcy Act permits its beneficiaries to live beyond their means, gamble, enter into guarantees, make gifts, and be negligent, all at the expense of their creditors. In the other common-law countries (England and her colonies), such conduct either is or may be a bar to discharge. Bankruptcy Act 1914 (4 & 5 Geo. V, c. 59) S. 26 (3), Tindale, Davis & Johnston, at page 64; The Law of Insolvency in British India, by D. F. Mulla, par. 403 et seq. In the civil law countries, it not only prevents "rehabilitation" (their graphic word for the process of discharge), but also may result in the bankrupt's going to jail. French Code of Commerce, 10th title, articles 584–586; Chilean Bankruptcy Law, Law No. 4558, article 189, quoted in "Revista Del Colegio de Abogados de Buenos Aires," Nos. 4, 5, and 6, vol. VIII, 1930, and No. 1, vol. IX, 1931; German "Konkursordnung" (1900) article 240. We took occasion to call this difference in attitude to the attention of the American Bar Association Committee on Commercial Law and Bankruptcy January 21, 1927. The committee in its report to the Association did me the honor to refer to my testimony as follows: "As pointed out by a United States District Judge, 'This is a new country with enormous resources and enormous opportunities for disregarding loss. The continental countries are old and are not able to do that. We are rapidly reaching a stage where we cannot continue to do it. We will have to consider the loss and we will have to stop these expensive and careless methods. In other words, this country is realizing that it cannot go ahead in the free and easy manner that it has up to this time.' " Reports of American Bar Association, vol. 52, 1927, at page 260. One might observe that in the in-tervening seven years the country has, in sackcloth and ashes, fully arrived at the realization we spoke of. Neither the bar association nor the Congress has yet crystallized that realization. Under our system it is particularly necessary to give the consuming public a voice in determining the character of the bankruptcy. A provision similar to that of the English act would seem appropriate. The statute of George V reads as follows: "On the hearing of the application the court shall take into consideration a report of the official receiver as to the bankrupt's conduct and affairs (including a report as to the bankrupt's conduct during the proceedings under his bankruptcy), and may either grant or refuse an absolute order of discharge, or suspend the operation of the order for a specified time, or grant an order of discharge subject to any conditions with respect to any earnings or income which may afterwards become due to the bankrupt, or with respect to his after-acquired property." Bankruptcy Act 1914 (4 & 5 Geo. V, c. 59) S. 26 (2), Tindale, Davis & Johnston, at page 59.

In France a similar procedure is provided. Section 584 of the Code of Commerce as translated reads: "Cases of bankruptcy will be punished according to the penalties of the criminal code and passed on by the police magistrates on the initiative of either the syndics or of any creditor or the ministry of justice." A prosecution automatically denies rehabilitation. See, also, Faillite, Bertrande, p. 263, and analogous provisions of the other foreign Codes cited. In the United States, on the other hand, the law is both unusually lenient, and yet does not set up an effective procedure for ascertaining if there is occasion for that leniency.

We are, as we have said, without authority to determine the merits of the application in the case at bar. We repeat therefore we do not express any opinion upon the truth or falsity of the specifications of objections. We might suggest the general wisdom of refuting any sincere reflection upon one's integrity. Too often the opportunity to do so is not afforded. However, that is not our problem.